**IN THE UNITED STATES DISTRICT COURT**

**MIDDLE DISTRICT OF GEORGIA**
**COLUMBUS DIVISION**

JERRY WAYNE WILLIS, JR.,                CIVIL ACTION
                                        NO. 4:25-cv-167 (CDL)

Plaintiff,

v.

CITY OF COLUMBUS, GEORGIA, et al.,

Defendants.

**PLAINTIFF'S RENEWED MOTION FOR SUMMARY JUDGMENT ON LIABILITY**
**AND MEMORANDUM OF LAW IN SUPPORT**

## I. INTRODUCTION

This case fails at the first link.

This motion seeks summary judgment on liability as to Count I, Count II, Count IV, and Count V of the operative complaint. Count I concerns the warrantless entry and search; Count II concerns the arrest as fruit of the entry and search; Count IV concerns deliberate indifference to serious medical needs; and Count V concerns municipal liability. This motion does not seek summary judgment on Count III, the malicious-prosecution claim.

Defendants claim Batastini and Collins were justified in responding to Plaintiff's home because a 911 hang-up call was tied to Plaintiff's address. But the produced record does not establish how Plaintiff's address entered the event, what source data supported that address association, or whether Batastini's statement that dispatch reported the call "pinging from this address" was true.

The record shows a 911 hang-up/no-answer call. The AT&T/Cricket subscriber record identifies the callback number as registered to Franasco Lopez at 5255 Oxford Dr., Columbus, Georgia, not Plaintiff's residence, and provides no handset-location data tying the call to 2925 Rose Avenue. Yet Plaintiff's address became attached to the CAD event, and Batastini later stated that dispatch told him there was an unknown 911 call "pinging from this address." (Ex. A, pp. 1, 7; Ex. J, p. 1; Ex. C-1, at 19:12:00.)

That matters because Defendants bear the burden of proving the lawfulness of a warrantless home entry. That burden begins with the foundational factual predicate: why officers were sent to this specific residence. Plaintiff renewed his motion to compel the source, audit, provenance, routing, and address-entry records that would answer that question. The Court denied that renewed motion. The summary-judgment record is therefore fixed. Defendants cannot meet their burden to

justify the warrantless home entry on this fixed record. On that fixed record, Defendants have an address attached to a 911 hang-up event, but no source foundation proving how or why Plaintiff's home became the target of the response. (Ex. F, pp. 2-4; Ex. H, p. 1.)

Count I fails first at the address-predicate stage. Defendants must prove a lawful basis for the warrantless entry and search, but the fixed record provides no source foundation tying the 911 hang-up call to Plaintiff's residence. Without that address predicate, the threshold approach, emergency-aid rationale, protective sweep, plain-view theory, and search all lack a lawful foundation. Defendants cannot use an unverified address association as the foundation for a warrantless home entry.

Defendants' defense to Count I then depends on collapsing three distinct Fourth Amendment doctrines into one after-the-fact justification. Emergency aid is used to explain the threshold entry; protective sweep is used to justify moving through the residence; and plain view is used to justify evidence found only after officers were inside. Those doctrines do not merge, and each fails for a different reason.

Emergency aid fails because the pre-entry facts did not establish an objectively reasonable basis to believe someone inside needed immediate aid. Officers had no identified caller, no identified victim, no report of injury, no screams, no violence, no forced entry, no contact with anyone inside, no arrest being executed, and a closed exterior screen door.

Protective sweep fails because it required lawful presence and a limited safety purpose. Officers had no warrant, no consent, no valid emergency-aid basis for entering, no arrest inside the residence, and no facts supporting a search beyond a safety check. The record instead shows a post-entry bedroom search, an opened gun case, a serial-number check, Collins searching for "anything else," a pull-out tray, and item manipulation.

Plain view fails because it required lawful presence and immediately apparent contraband. It cannot cure an unlawful entry, and it cannot be created through item movement, tray manipulation, or after-the-fact report framing.

Count II fails because the arrest depended entirely on evidence obtained after the unconstitutional entry and search.

Count IV stands separately. Plaintiff was already in heat-related distress from yard work when Batastini encountered him; the video then shows that crisis escalating after custody, transport, jail intake, and delayed hospital care. Plaintiff repeatedly requested water and hospital care, stated he was about to pass out and having trouble breathing, and Batastini stated the hospital was "back the way we came," chose jail first, questioned Plaintiff's ambulance request, and transported Plaintiff only after the jail nurse could not obtain a blood-pressure reading and ordered hospital transport. (Ex. C-1; Ex. G.)

The Court should grant summary judgment on liability. Alternatively, the Court should enter Rule 56(g) findings locking the facts that Defendants cannot now supply through missing video, missing source records, or counsel argument.

## II. STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court views the evidence in the light most favorable to the non-moving party, but a dispute is genuine only if the record would allow a reasonable jury to return a verdict for that party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Where video or other record evidence controls the factual picture, the Court should view the facts in the light depicted by that record. Scott v. Harris, 550 U.S. 372, 380-81 (2007). The Court may also identify material facts that are not genuinely in dispute. Fed. R. Civ. P. 56(g).

## III. CORE UNDISPUTED FACTS

### A. The produced record does not establish why Plaintiff's home became the target of the 911 hang-up response.

The produced CAD shows a 911 hang-up/no-answer call, and Plaintiff's address became attached to the event. (Ex. A, pp. 1, 7.)

The AT&T/Cricket subscriber record identifies the callback number as registered to Franasco Lopez at 5255 Oxford Dr., Columbus, Georgia, not Plaintiff's residence, and provides no handset-location data tying the call to 2925 Rose Avenue. (Ex. J, p. 1.)

Batastini later explained on BWC that dispatch told him there was an unknown 911 call "pinging from this address." (Ex. C-1, at 19:12:00.) This attribution provides no independent verification and cannot substitute for the missing provenance records.

The produced record does not establish how Plaintiff's address entered the event, who entered or verified it, what source data supported it, whether the address was automatically supplied, manually entered, modified, inferred, or otherwise inserted, or whether the alleged "pinging from this address" statement was true.

Plaintiff renewed his motion to compel the audit, journal, address-entry, provenance, PSAP, ALI/ANI, routing, and related source records needed to test that predicate. The Court denied further compulsion. Defendants must therefore defend the entry on the record they produced. (Ex. F, pp. 2-4; Ex. H, p. 1.)

### B. The pre-entry facts did not establish an emergency.

Even setting aside the unresolved address predicate, the record contains no objective facts establishing a person inside needed immediate aid. The event was a 911 hang-up/no-answer call. Officers had no caller contact, no identified victim, no report of injury, no report of violence, no screams, no forced entry, and no confirmation anyone was inside. (Ex. A, p. 1.)

Batastini's explanation to Plaintiff was that officers got an unknown 911 call, saw the door open, and went in "to make sure everything was all right." As Plaintiff challenged the legality of the entry, Batastini attempted to mute or stop his BWC, but the recording continued and captured his explanation: Plaintiff stated there was "nothing illegal" about the door being open, and Batastini

3

agreed, "There is nothing illegal about that." He then fell back on the speculative explanation that he announced "CPD" three times, received no answer, and thought "somebody might be laid out in there." Those statements show the entry was based on possibility, not objective emergency facts. (Ex. C-1, at 19:01:20.)

### C. The patrol explanation converted a 911 hang-up event into a home-entry rule.

Batastini and Odom both described the same operational logic: 911 hang-up/no answer, open door, enter, clear, and treat anything seen as plain view.

Odom stated: "If we get an E 911 call, we enter the residence to make sure that person is okay. We go to the, we clear the residence. If there's something laying inside just plain view. It is, it's fair game, sir." (Ex. I, at 20:51:31.)

Odom further justified the entry by saying officers had to check whether someone inside was "bleeding, stabbed, or been shot." Batastini used similar language with neighbors, explaining that officers entered to make sure no one was "dead or dying" and invoking a hypothetical "grandma" being dead inside. (Ex. I, at 20:51:31; Ex. C-1, at 19:12:00.)

The problem is that none of those emergency scenarios appeared in the pre-entry record.

### D. Critical Batastini BWC footage is missing from the produced record.

The produced Batastini BWC does not show the arrival, threshold approach, announcement, screen door, entry, initial bedroom search, or opening of the gun case. Collins' BWC audibly begins with the "RECORDING" prompt as he crosses the threshold. Batastini's produced video begins mid-event, after entry and search, with Batastini already exiting the back door. The missing Batastini footage is the footage that would show the facts Defendants need to justify the entry and initial search. (Ex. C-1; Ex. B.)

That absence is especially significant because Batastini's report states, "Our department issued body cameras were operational during this investigation," and Batastini later told Odom he had been recording and had everything on body cam. The Court denied further compulsion; on the fixed record, Defendants cannot use missing footage to prove what happened during the approach, threshold crossing, initial bedroom search, or gun-case opening. (Ex. D-1; Ex. I, at 20:58:50.)

### E. The search and arrest flowed from the entry.

All alleged contraband observations, the gun-case opening, serial-number check, pull-out tray inspection, item collection, and arrest occurred after the threshold crossing. The arrest theory therefore depends entirely on downstream evidence obtained after the address association, entry, and search. (Ex. B.)

### F. The medical-care record separately shows Plaintiff's escalating heat-related crisis.

Plaintiff repeatedly stated he was overheating, dehydrated, could not breathe, needed water, was about to pass out, and needed hospital care. Batastini responded, "And then if you faint, I'll take you to the hospital." When Plaintiff asked to be taken straight to the hospital, Batastini responded,

4

"Well, the hospital's back the way we came." At jail intake, when Plaintiff requested an ambulance, Batastini responded, "For what?" The jail nurse then ordered hospital transport. (Ex. C-1; Ex. G.)

## IV. COUNT I: THE WARRANTLESS ENTRY AND SEARCH VIOLATED THE FOURTH AMENDMENT

### A. Defendants cannot justify a warrantless home entry on an unproven address predicate.

Defendants bear the burden of proving the lawfulness of a warrantless home entry. That burden begins with the foundational factual predicate: why officers were sent to this specific residence.

The produced record does not answer that question. It shows a 911 hang-up/no-answer call. The AT&T/Cricket subscriber record identifies the callback number as registered to Franasco Lopez at 5255 Oxford Dr., Columbus, Georgia, not Plaintiff's residence, and provides no handset-location data tying the call to 2925 Rose Avenue. Yet Plaintiff's address became attached to the event, and Batastini later stated that dispatch told him the call was "pinging from this address." (Ex. A, pp. 1, 7; Ex. J, p. 1; Ex. C-1, at 19:12:00.)

The produced record does not establish how Plaintiff's address entered the event, who entered or verified it, what source data supported it, or whether the "pinging from this address" statement was true. That gap matters because everything Defendants use downstream depends on that first link. The threshold approach, open-door observation, no-answer announcement, claimed emergency-aid rationale, protective sweep, plain-view theory, search, arrest, and qualified-immunity defense all depend on the premise that the 911 hang-up event was validly tied to Plaintiff's residence.

The Court's denial of further compulsion fixes the record for summary judgment. Defendants must justify the warrantless entry on the record produced in discovery. On that record, there is no source foundation establishing how Plaintiff's address entered the 911/CAD event, what data supported that association, or whether the "pinging from this address" statement was true. The absence of that source foundation matters because the address association is the first link in the warrantless-entry chain. (Ex. F, pp. 2-4; Ex. H, p. 1.)

An unproven address association cannot serve as the foundation for a warrantless home entry.

### B. The emergency-aid theory independently fails.

Emergency aid requires an objectively reasonable basis to believe someone inside needs immediate aid. Brigham City v. Stuart, 547 U.S. 398, 403 (2006). The facts known before entry did not meet that standard.

Officers had a 911 hang-up/no-answer call. They had no identified caller, no identified victim, no report of injury, no report of violence, no screams, no forced entry, no visible person in distress, no arrest being executed, and no confirmation anyone was inside. The exterior screen door was closed. (Ex. A, p. 1; Ex. C-1; Ex. I.)

The BWC captures the critical threshold-explanation sequence. As Plaintiff challenged the legality of the entry, Batastini attempted to mute or stop his BWC, but the recording continued and captured his explanation. Plaintiff stated there was "nothing illegal" about the door being open, and Batastini agreed: "There is nothing illegal about that." Batastini then shifted to the explanation that he announced "CPD" three times, received no answer, and thought "somebody might be laid out in there." (Ex. C-1, at 19:01:20.) That sequence confirms the defect in the emergency-aid theory: the closed exterior screen door remains the controlling threshold fact, the open interior door did not itself create exigency, and Batastini's stated reason for entry was a hypothetical possibility, not an objective emergency fact known before entry. His later "dead or dying" and "grandma" hypotheticals reflected the same after-the-fact rationale. (Ex. C-1.)

Post-entry observations about renovation conditions, interior clutter, or items inside the residence cannot create the pre-entry emergency-aid facts the Fourth Amendment requires.

The Fourth Amendment does not permit warrantless home entry based on imagined emergency possibilities. Emergency aid requires objective facts known before entry. The produced record contains none.

The repeated explanations reveal the constitutional defect. Batastini and Odom treated emergency aid and protective sweep as one elastic doctrine: an unknown E911/no-answer call, a closed exterior screen door with an open interior door behind it, and no response became authority to enter, "clear" the home, and treat anything seen as plain view. But emergency aid must justify the threshold crossing with objective facts known before entry, and protective sweep cannot supply that initial authority. (Ex. C-1; Ex. I.)

## C. Protective sweep fails because officers lacked lawful presence and exceeded the permissible scope.

Protective sweep required lawful presence before the sweep began. Maryland v. Buie, 494 U.S. 325 (1990). Batastini and Collins had no warrant, no consent, no arrest inside or outside the home, and no valid emergency-aid basis. Protective sweep cannot justify the initial entry.

Because no arrest had occurred before entry, and officers had no warrant, consent, or independent lawful presence inside the residence, "protective sweep" cannot justify the initial threshold crossing.

The search also exceeded protective-sweep limits. Plaintiff testified that the gun case was closed and that he knew that fact because the gun case was his. (Deposition of Jerry Wayne Willis, Jr., Doc. 62, at 33:3-11.) The produced Batastini BWC does not show the arrival, entry, initial bedroom search, or opening of the gun case. By the time Collins became involved, the case was already open. Defendants cannot use missing footage to defeat Plaintiff's sworn testimony or prove what happened during the unproduced search window. (Ex. C-1; Ex. B.)

Collins' conduct then expanded beyond any safety sweep. Batastini directed him to address the firearm issue, but Collins remained in the bedroom, used a flashlight, focused on a pull-out tray, collected items, and later explained he was "just making sure there wasn't anything else." That is not emergency aid. That is not a protective sweep. (Ex. B; Ex. C-1, at 19:21:42.)

**D. Plain view cannot cure the entry or the search.**

Plain view requires lawful presence and an immediately apparent incriminating character. Horton v. California, 496 U.S. 128 (1990). Officers may not move, inspect, or manipulate items to create plain view. Arizona v. Hicks, 480 U.S. 321, 325-26 (1987).

Plain view cannot retroactively justify the entry. Any alleged plain-view observation occurred only after the address association, threshold crossing, and bedroom search.

The plain-view theory also fails on its own facts. Batastini later asked Collins whether the items were in plain view. Collins admitted he had to move the tray out to pick them up. Batastini then clarified the report framing: as long as Collins saw it in plain view and did not have to "open anything" or "move anything to get to it," they would "annotate all this." (Ex. C-1, at 19:21:42.)

That exchange shows plain-view framing after the fact, not an immediately apparent plain-view observation from a lawful vantage point.

## V. COUNT II: THE ARREST LACKED PROBABLE CAUSE

The arrest depended entirely on evidence obtained after the disputed address association, warrantless entry, and search. There was no independent probable cause before officers entered Plaintiff's home.

If the address predicate fails, the chain fails. If the entry fails, the search fails. If the search fails, the arrest cannot rest on the evidence discovered during that search.

The arrest theory therefore cannot survive summary judgment because Defendants' probable-cause chain begins only after the constitutional violation.

## VI. COUNT IV: BATASTINI WAS DELIBERATELY INDIFFERENT TO PLAINTIFF'S SERIOUS MEDICAL NEEDS

Count IV is independently controlled by the video record.

The medical-care sequence is captured by lodged video. Ex. G — Batastini In-Car BWC shows Plaintiff's condition during transport. Ex. C-1 — Batastini BWC (Residence → Hospital, Part 1; redacted; stops mid-hospital) and Ex. C-2 — Batastini BWC (Hospital, Part 2) show the pre-arrest events, jail intake, hospital sequence, and that portions of the jail/hospital sequence are missing because the recording stops and restarts during key moments.

Plaintiff was already in heat-related distress from yard work when Batastini encountered him. After custody began, the video shows that condition escalating. Plaintiff repeatedly requested water, fresh air, and hospital care. He stated he was about to pass out, could not catch his breath, believed he was dehydrated or overheating, and needed medical help. (Ex. C-1; Ex. G.)

Batastini understood the risk. When Plaintiff said he was going to faint, Batastini responded: "And then if you faint, I'll take you to the hospital." That response shows the threshold Batastini applied: he would take Plaintiff to the hospital only if Plaintiff fainted, despite Plaintiff already reporting heat-related distress, dehydration, breathing difficulty, and feeling like he was about to pass out. (Ex. C-1; Ex. G.)

When Plaintiff asked to be taken straight to the hospital, Batastini answered: "Well, the hospital's back the way we came." That statement confirms Batastini knew hospital care was nearby and had been bypassed. He continued to the jail anyway. (Ex. C-1; Ex. G.)

At jail intake, Plaintiff requested an ambulance. Batastini responded: "For what?" The jail nurse then ordered hospital transport. (Ex. C-1.)

This sequence establishes actual knowledge and disregard. Batastini did not merely fail to respond instantly. He chose jail over hospital, ordinary transport over emergency escalation, minimized Plaintiff's symptoms, resisted medical escalation, and transported Plaintiff only after jail medical staff refused intake until Plaintiff received hospital clearance. Transporting Plaintiff after jail medical staff required hospital clearance does not establish constitutionally adequate care. It confirms the opposite: Plaintiff's condition had escalated to the point that jail medical staff would not process him without hospital clearance. That later transport does not cure the earlier delay; it shows the crisis had escalated beyond what jail medical staff would accept.

Summary judgment should be granted on Count IV.

## VII. COUNT V: MUNICIPAL LIABILITY UNDER CITY OF CANTON

This case also supports municipal liability because the violation occurred at a recurring patrol decision point: how officers respond at the threshold of a home after a 911 hang-up/no-answer event.

The City had dispatch processes for creating and assigning the event. But the record shows patrol treated that event as authority to enter and clear the home. Odom stated the rule plainly: "If we get an E 911 call, we enter the residence," clear it, and anything in plain view is "fair game." Batastini described the same practice to Plaintiff and neighbors, repeatedly explaining that officers entered because of the unknown 911 call, no answer, and open door. (Ex. I, at 20:51:31; Ex. C-1, at 19:12:00.)

That is the failure-to-train issue. Patrol needed training on the constitutional boundary between investigating a residence and crossing the threshold without a warrant. The record shows that boundary was not honored. Officers converted a 911 hang-up/no-answer event into a warrantless home entry, search, plain-view seizure, and arrest.

Under City of Canton v. Harris, 489 U.S. 378 (1989), municipal liability exists where the need for training is obvious and the failure to train is likely to result in constitutional violations. 911 hang-up/no-answer calls at residences are recurring events. The need to train officers on the constitutional limits of entry is obvious. The violation here occurred exactly at that training gap.

Summary judgment should be granted on Plaintiff's municipal-liability claim, or at minimum, the Court should enter Rule 56(g) findings establishing the patrol-side practice and training gap.

## VIII. QUALIFIED IMMUNITY DOES NOT APPLY

Qualified immunity fails at every layer.

8

First, no reasonable officer may rely on an unverified address predicate to justify a warrantless home entry where the record does not establish how the 911 hang-up event became tied to the residence.

Second, the address issue does not save the entry. No reasonable officer could convert a 911 hang-up/no answer, no caller contact, no identified victim, no injury report, no violence, no forced entry, and a closed screen door into emergency aid.

Third, no reasonable officer could use protective sweep or plain view to justify opening a gun case, remaining in the bedroom to look for "anything else," manipulating a pull-out tray, collecting items, and then framing the seizure as plain view after the fact.

Fourth, no reasonable officer could respond to Plaintiff's escalating heat-related medical crisis by delaying hospital care until jail intake forced the issue.

This is not a case where officers lacked legal guidance. They invoked the governing exceptions. The facts did not meet the standards those exceptions require. They entered anyway. Qualified immunity should be denied.

## IX. ALTERNATIVELY, THE COURT SHOULD ENTER RULE 56(g) FACTS

If the Court does not grant summary judgment in full, it should enter Rule 56(g) findings establishing the following facts:

1. The produced CAD shows a 911 hang-up/no-answer call. (Ex. A, p. 1.)

2. The AT&T/Cricket subscriber record identifies the callback number as registered to Franasco Lopez at 5255 Oxford Dr., Columbus, Georgia, and provides no handset-location data tying the call to 2925 Rose Avenue. (Ex. J, p. 1.)

3. Plaintiff's address became attached to the CAD event. (Ex. A, p. 7.)

4. The produced record does not establish how Plaintiff's address entered the 911/CAD event.

5. The produced record does not contain source data proving that the 911 hang-up call originated from, was located at, or was otherwise tied by handset-location data to Plaintiff's residence.

6. Batastini stated on BWC that dispatch reported an unknown 911 call "pinging from this address." (Ex. C-1, at 19:12:00.)

7. Plaintiff renewed his motion to compel CAD provenance, PSAP/ALI-ANI/routing provenance, and BWC integrity/source records. (Ex. F, pp. 2-4.)

8. The Court denied Plaintiff's renewed motion to compel. (Ex. H, p. 1.)

9. Officers had no identified caller, no identified victim, no report of injury, no forced entry, no violence, no screams, and no confirmed person inside before entry.

10. The exterior screen door was closed, and the open door was the interior door behind it. (Ex. I, at 20:51:31.)

11. Batastini acknowledged there was "nothing illegal" about the open door, then justified entry by saying he thought "somebody might be laid out in there." (Ex. C-1, at 19:01:20.)

12. Batastini and Collins entered without a warrant.

13. Defendants do not claim Plaintiff consented to entry.

14. Batastini's report states that the department-issued body cameras were operational during the investigation, and Batastini later told Odom he had been recording and had everything on body cam. (Ex. D-1; Ex. I, at 20:58:50.)

15. The produced Batastini BWC does not show the approach, threshold, entry, initial bedroom search, or opening of the gun case. (Ex. C-1.)

16. Collins' BWC begins with an audible "RECORDING" prompt as he crosses the threshold, while Batastini's produced footage begins mid-event after entry and search. (Ex. C-1; Ex. B.)

17. Batastini later asked Collins whether the items were in plain view; Collins stated he had to move the tray out to pick them up; Batastini then stated they would "annotate all this." (Ex. C-1, at 19:21:42.)

18. The arrest depended on observations and seizures made after entry.

19. Odom stated that if officers receive an E911 call, "we enter the residence," "clear the residence," and anything in plain view is "fair game." (Ex. I, at 20:51:31.)

20. Batastini stated that if Plaintiff fainted, he would take him to the hospital. (Ex. C-1; Ex. G.)

21. Batastini stated, when Plaintiff requested hospital care, that the hospital was "back the way we came." (Ex. C-1; Ex. G.)

22. Batastini responded "For what?" when Plaintiff requested an ambulance. (Ex. C-1.)

23. The jail nurse ordered hospital transport. (Ex. C-1.)

## X. CONCLUSION

Defendants fail at the first link. The produced record does not prove why Plaintiff's home became the target of the 911 hang-up response. The Court denied further compulsion, so Defendants must defend on the record they produced. That record contains Plaintiff's address attached to a 911 hang-up event, but no source foundation proving how or why Plaintiff's address entered the system.

Defendants fail at every link. They cannot prove the address predicate. They cannot justify the threshold entry. They cannot save the search through protective sweep or plain view. They cannot establish probable cause from evidence obtained only after the entry and search. Count IV independently establishes deliberate indifference.

Plaintiff respectfully requests that the Court grant summary judgment on Counts I, II, IV, and V. In the alternative, Plaintiff requests Rule 56(g) findings establishing the undisputed facts identified above.

Respectfully submitted,

/s/ Jerry Wayne Willis, Jr.

Jerry Wayne Willis, Jr.
Pro Se Plaintiff
2925 Rose Avenue
Columbus, GA 31904
678-458-4000
jwillis@georgiasociety.com

**EXHIBIT LIST**

Exhibit A - CAD 911 Event Record

Exhibit B — Collins BWC (8/28/2024), Previously Lodged Court Vault Media

Exhibit C-1 — Batastini BWC (Residence → Hospital, Part 1; redacted; stops mid-hospital), Previously Lodged Court Vault Media

Exhibit C-2 — Batastini BWC (Hospital, Part 2), Previously Lodged Court Vault Media

Exhibit D-1 - Batastini CPD Report

Exhibit F - Renewed Motion to Compel Source Record Requests

Exhibit G — Batastini In-Car BWC, Previously Lodged Court Vault Media

Exhibit H - Text-Only Order Denying Renewed Motion to Compel

Exhibit I — Odom BWC (Hospital), Previously Lodged Court Vault Media

Exhibit J - AT&T Cricket Subscriber Record

**CERTIFICATE OF SERVICE**

I certify that on this date I filed the foregoing via CM/ECF, which will serve all counsel of record.

/s/ Jerry Wayne Willis, Jr.

Jerry Wayne Willis, Jr.